# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| THE UNITED MEXICAN STATES, | No. 22-CV-4047-CJW-KEM |
| Petitioner, | **ORDER** |
| vs. | |
| JOSHUA DEAN NELSON, | |
| Respondent. | |

This matter is before the Court on petitioner The United Mexican States' ("Mexico") Petition for Recognition and Enforcement of Arbitration Award. (Doc. 1). Respondent Joshua Dean Nelson ("Nelson") filed an answer and resistance to the petition. (Doc. 17). Mexico then filed a Reply in Support of Petition for Recognition and Enforcement of Arbitration Award ("Reply"). (Doc. 20). Nelson, in turn, filed a motion to strike Mexico's Reply. (Doc. 21). Mexico then filed a response to that motion (Doc. 22), and Nelson filed a reply to that response (Doc. 24).

For the following reasons, the Court **grants** petitioner's Petition for Recognition and Enforcement of Arbitration Award (Doc. 1) and **denies** Nelson's motion to strike Mexico's reply (Doc. 21).

## I. BACKGROUND

### A. *The Underlying Dispute*

Nelson, a resident of the Northern District of Iowa, and Mr. Jorge Luis Blanco, nationals of the United States of America, together with Mr. Miguel Sacasa, a national of Mexico, wanted to enter and participate in the Mexican telecommunications market. For such purposes, on January 7, 2010, they incorporated Tele Fácil México, S.A. de

1

Case 5:22-cv-04047-CJW-KEM   Document 25   Filed 03/23/23   Page 1 of 18

V.C. ("Tele Fácil") under the laws of, and domiciled in, Mexico, with Sacasa owning 51% of the company, as required under Mexican law. (Doc. 1-3, Award, at ¶¶ 99-100).

On May 27, 2011, Tele Fácil applied to the Mexican Ministry of Communications and Transportation for a concession to install, operate, and exploit a public telecommunications network. (*Id.*, at ¶ 104). On May 17, 2013, the Mexican Secretariat of Communications and Transport granted Tele Fácil a concession to operate a public communications network for a period of 30 years. (*Id.*, at ¶ 105). The concession authorized Tele Fácil to offer "[a]ny telecommunication service which can technically be provided by its infrastructure, except broadcasting services" in Mexico City (DF), Guadalajara (Jalisco), La Soledad (Jalisco) and Monterrey (Nuevo León). (*Id.*). To provide its services, Tele Fácil had to interconnect with a Mexican carrier, otherwise Tele Fácil's customers would only be able to communicate with other customers in the same network. (*Id.*, at ¶ 106). Tele Fácil interconnected with Teléfonos de México and Teléfonos del Noroeste (jointly, "Telmex"), the largest telecommunications carrier in Mexico, on an indirect interconnection basis so that Tele Fácil could route its traffic through a larger carrier, which had already established sufficient capacity with Telmex and was able to lease excess capacity to Tele Fácil to indirectly deliver traffic to Telmex. (*Id.*, at ¶ 107). Tele Fácil selected Nextel to indirectly interconnect to Telmex's network through Nextel. (*Id.*).

On June 11, 2013, the Mexican government enacted several amendments to the Mexican Constitution on telecommunication matters. (*Id.*, at ¶ 109). These included the creation of the Federal Institute of Telecommunications ("IFT"), which was granted the power to oversee economic competition in the telecommunications sector. (*Id.*). Thereafter, the IFT took certain actions and adopted certain resolutions that impacted Tele Fácil and Telmex's ability to compete in the marketplace. (*Id.*, at ¶¶ 110-140).

2

Two relevant events occurred between August 7, 2013, when Tele Fácil requested interconnection with Telmex, Telmex's response on August 26, 2013, and Tele Fácil's reply on July 8, 2014: (a) on March 6, 2014, the IFT declared América Móvil, S.A.B. de C.V. and its subsidiaries, which included Telmex, as a preponderant economic agent in the telecommunications sector; and (b) on March 26, 2014, the IFT issued specific asymmetrical regulations, including requiring Telmex to provide indirect interconnection and a special mandatory interconnection rate. (*Id.*, at ¶ 233). If, under Mexican law, Tele Fácil's July 2014 reply letter constituted an acceptance of Telmex's offer, it would mean that there was consent on all of the terms and conditions of the interconnection agreement between Telmex and Tele Fácil, including the rates but excluding indirect interconnection and portability, as of the date of the acceptance. (*Id.*, at ¶ 234). If the letter did not constitute an acceptance, it would mean that there was no consent on the terms and conditions of interconnection and therefore no agreement on the rates. (*Id.*).

### B. The Arbitration

On September 26, 2016, Nelson delivered a Notice of Arbitration against Mexico on his own behalf and on behalf of Tele Fácil. (Doc. 1-3, Award, at ¶¶ 3, 10). Nelson sought money damages from Mexico arising from a series of alleged acts by the IFT that, according to Nelson, harmed his investment and all prospects of entering the Mexican telecommunications market. (*Id.*, at ¶ 6). Nelson's arbitration demand was made under the terms of the North American Free Trade Agreement ("NAFTA" or "Treaty"). (*Id.*, at ¶ 1).

NAFTA is a treaty entered into by the United States, Mexico, and Canada. North American Free Trade Agreement, Dec. 17, 1992, 32 I.L.M. 289-456, 605-799. Chapter Eleven of NAFTA requires the three countries to provide certain protections to foreign investors, including obligations not to expropriate without fair compensation and to accord fair and equitable treatment to foreign investors.

Chapter Eleven, Section B of NAFTA establishes a procedural mechanism under which private foreign investors may initiate an international arbitration action directly against a party government of the country in which their investments were made based on alleged violations of Chapter Eleven. Similar to remedies provided in other international trade agreements and bilateral investment treaties, investors can seek monetary damages for these alleged violations. Nelson availed himself of this mechanism by filing the arbitration claim that led to the Award that Mexico now seeks to enforce.

Under NAFTA Article 1122, each of the party governments gave advance consent to arbitrate claims filed by investors under the procedures set out in Chapter Eleven. The submission of a claim to arbitration by a private party, in combination with this advance consent of the governments, constitutes an agreement to arbitrate. For the avoidance of doubt, NAFTA Article 1122(2) makes clear that:

> The consent given by paragraph 1 and the submission by a disputing investor of a claim to arbitration shall satisfy the requirement of . . . . Article II of the New York Convention for an agreement in writing . . . .

Nelson also expressly consented to the arbitration. Nelson's Amended Notice of Arbitration states: "Claimants have consented to arbitration by submitting a claim to arbitration against Respondent pursuant to NAFTA Articles 1116(1), 1117(1) and 1120(1)(c)." (Doc. 1-5, at ¶ 14).

Under NAFTA Article 1120, a claimant may choose from two sets of arbitration rules: the 1976 UNCITRAL Arbitration Rules, and either the International Convention on the Settlement of Investment Disputes ("ICSID Convention") (when the respondent country is a member of the ICSID Convention) or the Additional Facility Rules of the ICSID (when the respondent country is not a member). Nelson brought his case under the 1976 UNCITRAL Arbitration Rules. (Doc. 1-5, at ¶ 1). The International Centre for the Settlement of Investment Disputes ("ICSID") was commissioned to administer the

4

proceedings notwithstanding that the UNCITRAL Rules were being applied. (Doc. 1-3, Award, at ¶ 1). The arbitral tribunal was comprised of three individuals, including one appointed by each party. (*Id.*, at ¶¶ 12, 19).

On July 7, 2017, the Tribunal held a first procedural hearing with the parties via conference call. (*Id.*, at ¶ 21).

On July 18, 2017, following that conference call, the Tribunal issued Procedural Order No. 1, which provided, among other things, that the procedural languages would be English and Spanish, and that the place of the proceedings (or "seat") would be Toronto, Canada. (*Id.*, at ¶ 22).

Between the summer of 2017 and the fall of 2018, the Tribunal subsequently directed, oversaw, and resolved disputes involving production of discovery between the parties involving production of documents and expert reports. (*Id.*, at ¶¶ 24-61).

On January 9, 2019, the parties exchanged lists of witnesses and experts they intended to call at a hearing on the dispute. (*Id.*, at ¶ 62).

From April 22, 2019, to April 26, 2019, a hearing on jurisdiction and the merits of the dispute was held in Washington, D.C. (*Id.*, at ¶¶ 78). Both parties appeared; Nelson appeared in person at the hearing and was represented by attorneys. (*Id.*). Witnesses and experts were called by each side. (*Id.*). The government of the United States was present at the hearing pursuant to rights granted to non-participating governments under NAFTA Article 1128. (*See id.*). After the hearing, the parties submitted post-hearing briefings and submissions. (*Id.*, at ¶¶ 79-92).

  C. *The Arbitration Tribunal's Ruling*

In its ruling, the Tribunal first concluded that it had jurisdiction, overruling Mexico's challenge, finding that Nelson exercised legal and de facto control over Tele Fácil. (*Id.*, at ¶ 203). Next, the Tribunal addressed the merits of Nelson's claims against Mexico. Nelson raised two claims: (i) that Mexico expropriated his investments in breach

5

of NAFTA Article 1110, and (ii) that Mexico failed to accord Nelson "fair and equitable treatment" in violation of NAFTA Article 1105. The Tribunal denied both claims. (*Id.*, at ¶¶ 281-84, ¶ 349, and ¶¶ 382-85).

A key issue in resolving these claims was whether Tele Fácil's July 2014 reply letter constituted an acceptance and therefore formed a binding agreement. The Tribunal ultimately found that it did not. (*Id.*, at ¶ 240). Because of that finding, the Tribunal found that Tele Fácil had no rights capable of being expropriated. (*Id.*, at ¶ 280). The Tribunal summarized its assessment as follows:

> As stated above, Tele Fácil had, at best, a business opportunity, a bet based on its own interpretations and speculations, that was proven wrong. The speculative nature of the business opportunity that [Nelson] unsuccessfully attempts to qualify as "rights" at the core of the business of Tele Fácil is further confirmed by the overwhelming evidence on the record. This alleged opportunity and the income related thereto were never included in any business plan prepared by Tele Fácil. There is no explanation for the delay in accepting Telmex's offer for interconnection and then Tele Fácil's rush once Telmex was declared a preponderant agent. The main source of income of Tele Fácil, according to the evidence on the record, did not depend on the alleged "rights" purportedly granted by Resolution 381. On the contrary, the vast majority of the income depended on different lines of business, unrelated to these "rights," lines of business that Tele Fácil could have pursued but it decided not to. Nelson cannot ask this Tribunal to find Respondent liable for Tele Fácil having failed on a bet supported on assumptions and speculations that were proven incorrect.

(*Id.*, at ¶ 281) (footnotes omitted).

The last issue addressed in the Award was costs. NAFTA Article 1135 states that "[a] tribunal may also award costs in accordance with the applicable arbitration rules." Mexico argued to the Tribunal that Nelson should bear all costs and expenses of the proceedings, including Mexico's legal fees and expenses. The Tribunal stated:

> Claimant has failed in all his claims before this Tribunal and even though it is true that Respondent failed in its jurisdictional objection, the changes

6

and delays in the jurisdictional objections and the need to submit additional jurisdictional objections resulted from the late information submitted by Mr. Blanco as to his bankruptcy, his subsequent withdrawal from the case and the new position of Mr. Nelson as sole Claimant.

Accordingly, the Tribunal, in exercise of its discretion, has decided that Claimant should (a) bear the arbitrators' fees and expenses and ICSID's administrative fees and direct expenses, for a total amount of (USD 948,375.03); (b) bear 80% of the costs of Respondent in the amount of USD 1,580,011.49;417 and (c) bear his own costs.

(*Id.*, at ¶¶ 394-95).

The Tribunal's decisions were formalized at the end of the Award:

For the reasons set forth above, the Tribunal decides as follows:
(1) Denies Respondent's objection to jurisdiction based on NAFTA Article 1117;
(2) Denies Claimant's claim of unlawful expropriation based on NAFTA Article 1110;
(3) Denies Claimant's claim of unfair and inequitable treatment based on NAFTA Article 1105; [and]
(4) Determines Claimant to pay Respondent the amount of USD 2,054,199.

(*Id.*, at ¶ 396). The Tribunal clarified that the $2,054,199 Nelson was found to owe to Mexico represented 80% of Mexico's costs ($1,580,011.49) plus the costs of the arbitration that were advanced by Mexico ($474,187.51). (*Id.*, at n.418).

### D. *The Ontario Court Action*

Following the Award, Nelson initiated an action in the Ontario Superior Court of Justice seeking to set aside the arbitration award. (Doc. 1-6). Before the Ontario Superior Court of Justice, Nelson argued that he was deprived of due process because the Tribunal decided the case on a novel theory neither side raised—that the July 2014 letter did not constitute an acceptance of an offer—and because the Tribunal ignored his expert evidence because it did not cite his experts in its written opinion and its conclusions

were contrary to Nelson's expert's opinions. (*See* Doc. 1-6, at 9). On February 16, 2022, the Superior Court dismissed the application. (*Id.*, at 2). Regarding the claim about the July 2014 letter, the Superior Court found that Nelson was not deprived of due process:

> After the completion of evidence, the tribunal expressly asked the parties to address the meaning and effect of the July 7, 2014 letter in oral submissions by answering the following question:
>
>> Question Four: What are the most relevant legal and evidential materials on the record to help the Tribunal decide whether under Mexican law the July 7, 2014, letter (Exhibit C-0024) constitutes an acceptance of an offer by Telmex or a counter-offer from Tele Fácil to Telmex or a third category?
>
> Both [Nelson] and [Mexico] addressed this question in oral submissions on the final day of the hearing. Moreover, both parties were invited to address this issue further in their written post-hearing briefs which were submitted more than 3 months later.
> [Mexico]addressed the negotiations leading up to the July 7, 2014 letter, as well as whether the July 7, 2014 letter constituted acceptance of Telmex's previous offer, in its post-hearing brief. [Nelson] chose not to do so.
> Thus, whether Tele Fácil's letter of July 7, 2014 created a binding interconnection agreement with Telmex was addressed in the parties' pleadings as well as the written reports prepared by the legal experts and was the subject of cross-examination and questions from the tribunal members during the hearing. Both parties put their positions squarely before the tribunal on this issue.
> There was no failure of fairness or natural justice.

(Doc. 1-6, at 10). The Superior Court also rejected Nelson's claim that the Tribunal ignored his expert evidence. (*Id.*, at 11-12). The Superior Court acknowledged that a tribunal cannot ignore evidence, but found that the tribunal did not do so, in part because it set out in great detail each side's positions even if it did not repeat each side's evidence verbatim. (*Id.*, at 11). The Superior Court found: "that the experts' arguments are fully

8

referenced and the tribunal's reasons for why it reached its conclusions are set out in detail. No one could reasonably be in any doubt about whether the tribunal considered the applicant's evidence or why the tribunal decided the case the way it did." (*Id.*, at 12).

NAFTA Article 1136(3)(b) states that "A disputing party may not seek enforcement of a final award until: . . . (b) in the case of a final award under . . . the UNCITRAL Arbitration Rules . . . (ii) a court has dismissed an application to revise, set aside or annul the award and there is no further appeal." Nelson did not appeal the decision of the Ontario Superior Court, and therefore allowed the award to become enforceable.

### E.    *Petition to Enforce the Arbitration Agreement*

On September 23, 2022, Mexico filed a petition in this Court to enforce the arbitration agreement. (Doc. 1). The Petition seeks recognition and enforcement of an arbitration award under Articles III and IV of the New York Convention. (*Id.*, at 1). Article III provides in relevant part:

> Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles.

The United States has codified this mandate at Title 9, United States Code, Section 207, which states:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

9

Article IV of the New York Convention instructs a petitioner on how to file for recognition and enforcement. Article IV provides:

> 1. To obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforcement shall, at the time of the application, supply:
> (a) The duly authenticated original award or a duly certified copy thereof;
> (b) The original agreement [to arbitrate] referred to in article II or a duly certified copy thereof.

Mexico argues it has satisfied each of these requirements. It has provided the Court with a copy of the Award, certified by ICSID. (Docs. 1-2 & 1-3). It has also provided the Court with a copy of the agreement to arbitrate—a combination of NAFTA Chapter Eleven and Nelson's Amended Notice of Arbitration. (Docs. 1-2, 1-4, 1-5). The Award became final on June 5, 2020, and Mexico submitted its petition within three years of that date.

### F. *Nelson's Response*

On November 1, 2022, Nelson filed an answer and resistance to the petition. (Doc. 17). In his answer, Nelson asserts that the Tribunal's award "is unenforceable as a matter of U.S. law because Mr. Nelson, and his company, Tele Fácil . . . were deprived of critical due process rights during the course of the proceedings." (*Id.*, at 1). Nelson's position hinges on the Tribunal's finding that the July 2014 letter did not constitute an acceptance of an offer forming a contract. (*Id.*, at 4-5). Nelson asserts he was deprived due process because:

> The Tribunal's sole indication to Tele Fácil that such an interpretation of the July 2014 letter could be dispositive of the entire Arbitration arose through one of ten post-trial questions to the parties, which stated:
>
> Question Four: What are the most relevant legal and evidential materials on the record to help the Tribunal decide

> whether under Mexican law the July 7, 2014, letter (Exhibit C-0024) constitutes an acceptance of an offer by Telmex or a counter-offer from Tele Fácil to Telmex or third category?
>
> During closing arguments at the Arbitration, both parties tendered argument to the Tribunal on the issue (in addition to addressing the other nine questions), but because the evidence phase of the proceedings had concluded, neither could offer evidence.

(*Id.*, at 5). Nelson also complains that the Tribunal did not cite to or reference his experts in its written decision. (*Id.*, at 5-6).

## II. ANALYSIS

The New York Convention, as incorporated into federal law, is intended "to encourage the recognition and enforcement in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 520 n.15 (1974). It "provide[s] businesses with a widely used system through which to obtain domestic enforcement of international commercial arbitration awards resolving contract and other transactional disputes, subject only to the minimal standards of domestic judicial review for basic fairness and consistency with national public policy." *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1440 (11th Cir. 1998). The refusal by courts of one country to enforce an international arbitration agreement frustrates the purposes of the New York Convention; "international comity is a fundamental principle deserving of substantial deference." *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 360 (8th Cir. 2007).

Under Article V of the Convention, a court may refuse recognition and enforcement of an arbitration award only if the party against whom it is invoked furnishes proof that:

11

>    (a) The parties to the [arbitration] agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
>    (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
>    (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or
>    (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or
>    (e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

New York Convention, Art. V(1); *see also* 9 U.S.C. § 201.

Here, Nelson invokes subsection V(1)(b), asserting that he "was otherwise unable to present his case." (Doc. 17, at 6). Nelson argues:

> The arbitration panel denied Tele Fácil's ability to present its case in two fundamental ways. First, the Tribunal failed to adequately place Tele Fácil on notice that the legal import of the July 2014 letter correspondence between the parties would be a dispositive issue in the arbitration. By ensconcing that topic within a laundry list of seemingly routine follow-up questions, the Tribunal created a classic "bait and switch" scenario that was impossible for Tele Fácil to overcome. Second, the Tribunal erred by effectively excluding the extensive evidence presented by Tele Fácil through its experts, Professor Alvarez and Mr. Soria, by determining that the purported "limited authority" of the IFT was "confirmed by the experts in this case." There is frankly no way to reach that conclusion based upon

12

the evidence submitted by Mr. Nelson and his experts, strongly indicating that the Tribunal failed to properly consider it.

Simply put, the Tribunal's procedural deviations and incorrect legal conclusions prevented Tele Fácil from adequately presenting its case as required by the New York Convention. By adjudicating an issue that was never disputed by the parties and thus not a point of contention in either the earlier proceedings in the Mexican courts or the Arbitration itself, the Tribunal violated Tele Fácil's due process right to effectively present its case.

(*Id.*, at 8).

In reply, Mexico argues that Nelson's claims are barred by res judicata. (Doc. 20, at 2). It points out that the claims Nelson raises with this Court are exactly the same ones he raised in the Superior Court of Ontario. (*Id.*, at 3-4). It argues that foreign country judgments must be given res judicata effect under principles of comity. (*Id.*, at 3). Alternatively, Mexico argues that Nelson's arguments fail on the merits for the same reasons the Superior Court of Ontario found them wanting. (*Id.*, at 4-8).

In response, Nelson moved to strike Mexico's reply to his answer to the petition, arguing that Mexico violated the Court's local rule by raising arguments that it could have anticipated previously, citing Local Rule 7(g), and thereby conceding that its original petition was defective. (Doc. 21).

Mexico replied that it could not have raised the res judicata argument in its original petitioner because it was not applicable until Nelson filed his resistance asserting the same grounds previously litigated in the Ontario Superior Court. (Doc. 22).

The Court will address Nelson's motion to strike first. Next, it will address Mexico's invocation of the res judicata doctrine before it turns to the merits of the parties' arguments.

### A. *Nelson's Motion to Strike*

Local Rule 7(g) provides that in reply briefs a party may "assert newly-decided authority or . . . respond to new and unanticipated arguments made in the resistance."

The purpose of this rule is to avoid endless pleadings by parties inundating the Court with endless briefing by parties and delaying a timely resolution of their disputes. District courts have considerable discretion in applying their local rules. *See Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 579 (8th Cir. 2006); *see also Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 856 (8th Cir. 2010) ("[D]istrict courts have broad discretion to manage their dockets and address particular circumstances by enforcing local rules[.]").

Here, the pleadings were filed in an unusual posture, not given to a straight-forward application of Rule 7(g). Mexico's opening pleading was captioned as a Complaint. (Doc. 1). Nelson's opening responsive pleading was captioned an Answer. (Doc. 17). This is not a case with a motion and memorandum in support, followed by a resistance and a reply brief. Rather, Mexico's opening pleading asserted a right to enforcement of an arbitration award. In a manner of speaking, then, Mexico's subsequent pleading is more akin to a motion for summary judgment than it is a "reply" to a brief.

Further, the Court finds that Nelson's answer raised issues that Mexico was not obligated to anticipate and raise in its petition to enforce the arbitration award. It was not unreasonable for Mexico to assume that Nelson would not raise precisely the same grounds to evade enforcement of the award that he raised once already in another court. Thus, Mexico's "reply" was in response to an argument it could not reasonably have anticipated.

Regardless, the Court would exercise its considerable discretion here to allow the filing of the "reply" even if it were in technical violation of Local Rule 7(g). Litigation should not turn on gamesmanship. Rule 7(g) is intended to avoid endless pleadings, and yet here Nelson filed a resistance to enforcement of the arbitration award, then a motion to strike, and then a reply to Mexico's objection to the motion to strike. In short, the parties have inundated the Court with multiple pleadings diverting the Court from

14

addressing the merits of this dispute—whether the arbitration award is enforceable. Moreover, Mexico's "reply" raises a legitimate and meritorious ground of res judicata that the Court would have addressed sua sponte after reading the Ontario Superior Court's opinion, even if Mexico had not raised the issue.

Thus, Nelson's motion to strike Mexico's Reply is **denied**.

### B. *Res Judicata*

Mexico argues that Nelson's attempt to assert claims of denial of due process is barred by the principle of res judicata. (Doc. 20, at 2-4). Preclusion doctrines are employed to conserve judicial resources and protect parties from "the expense and vexation" of relitigating claims and issues that have been previously adjudicated. *Tyus v. Schoemehl*, 93 F.3d 449, 453-54 (8th Cir. 1996) (abrogated on other grounds by *Taylor v. Sturgell*, 553 U.S. 880 (2008)). A final judgment will bar any subsequent suit if: "(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action." *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998).

The res judicata doctrine may apply even when the claim or issue involved was first litigated in a foreign court. *See Black Clawson Co. v. Kroenert Corp.*, 245 F.3d 759, 763 (8th Cir. 2001) ("Foreign adjudication of an issue may preclude its relitigation in our courts."). A foreign judgment is recognized, enforced, and given preclusive effect by a court of this country if the court finds five factors to be present. *Shen v. Leo A. Daly Co.*, 222 F.3d 472, 476 (8th Cir. 2000) (citing *Hilton v. Guyot*, 159 U.S. 113, (1895)). Previously litigated claims should not be retried if the reviewing court finds that the foreign court (1) provided a full and fair trial of the issues in a court of competent jurisdiction, (2) ensured the impartial administration of justice, (3) ensured that the trial was conducted without prejudice or fraud, (4) had proper jurisdiction over the parties,

15

and (5) the foreign judgment does not violate public policy. *Shen*, 222 F.3d at 476 (citing *Hilton*, 159 U.S. at 202-03).

Here, the Court finds res judicata bars Nelson's claims in resistance to enforcement of the arbitration award. Nelson does not seriously contend that the five factors discussed in *Shen* are not present here. The Court finds that the Ontario Superior Court provided a full and fair litigation of the very same issues Nelson raises here, and there is no question that it is a court of competent jurisdiction. There is no basis to find that Nelson was not ensured an impartial administration of justice. There is no evidence of prejudice or fraud. Nelson himself invoked the jurisdiction of the Ontario court so he cannot now claim it did not have proper jurisdiction over the parties. And there is nothing about the judgment that violates public policy. Therefore, the Court finds that Nelson's resistance to the petition is barred by the doctrine of res judicata. *See AVR Commc'ns., Ltd. v. Am. Hearing Sys., Inc.*, 793 F.3d 847, 851-52 (8th Cir. 2015) (applying res judicata doctrine to give preclusive effect to an Israeli court's judgment affirming an arbitration award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards).

### C. Enforceability of the Arbitration Award

Alternatively, even if the Court were to entertain Nelson's claims in resistance to the petition, it would enforce the arbitration award. Nelson claims he "was otherwise unable to present his case" before the Tribunal (Doc. 17, at 6), but for all the reasons stated by the Ontario Superior Court, this Court finds otherwise. Nelson had a fundamentally fair hearing before the Tribunal. Article V(1)(b) "essentially sanctions the application of [U.S.] standards of due process," which in this case, means a "fundamentally fair hearing." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 298-99 (5th Cir. 2004). *See also Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F.Supp.3d 112, 127 (D.D.C. 2015 ("The

16

Court will therefore assess Venezuela's claims under standards of American law, which require an arbitrator to provide a fundamentally fair hearing[.]"). A fundamentally fair hearing is one that meets "the minimal requirements of fairness—adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator." *Karaha Bodas*, 364 F.3d at 298-99 (internal quotation marks omitted). The parties must have an opportunity to be heard "at a meaningful time and in a meaningful manner." *Karaha Bodas*, 364 F.3d at 299; *Gold Reserve*, 146 F.Supp.3d at 127.

Here, Nelson had a fundamentally fair hearing. The importance of the July 2014 letter was raised, and Nelson had ample opportunity to address that issue and be heard. He did not have a right to prevail. Though Nelson claims he was not allowed to submit additional evidence after the hearing, he does not show he ever asked to do so. Further, the Tribunal provided Nelson an opportunity to present expert evidence and opinion. It was not bound, by due process, to agree with and adopt those opinions. This is simply not a case where the Tribunal misled Nelson or acted in an arbitrary manner or refused to accept or consider evidence. Thus, the Court is not persuaded by Nelson's citation to cases where those things happened. (*See* Doc. 17, at 6-7). In short, the Court finds that the Tribunal afforded Nelson due process and did not otherwise prevent him from presenting his case.

### D. *Interest*

Having found the arbitration award is enforceable, the last question is whether Mexico is entitled to prejudgment and post-judgment interest. "[P]rejudgment interest should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable." *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 752 (8th Cir. 1986). The interest rate is the prejudgment interest rate under applicable state law. *See, e.g.*, *J.C. Brager Co. v. Chesen*, 999 F. Supp. 675, 677 (D. Neb. 1998). Iowa Code Section 535.3(1) states: "Interest shall be allowed on all money

17

due on judgments and decrees of courts at a rate calculated according to section 668.13[.]" Iowa Code Section 668.13(3) provides that "[i]nterest shall be calculated as of the date of judgment at a rate equal to the one-year treasury constant maturity published by the federal reserve in the H15 report settled immediately prior to the date of the judgment plus two percent." On June 4, 2020—one day prior to the date of the award—the one-year treasury constant maturity published by the federal reserve was 0.17%. *See* Doc. 1-7).

Mexico is therefore entitled to prejudgment interest at the rate of 2.17% per annum. Mexico is further entitled to post-judgment interest in accord with Title 28, United States Code, Section 1961. *See Hillside Enters. v. Carlisle Corp.*, 69 F.3d 1410, 1416 (8th Cir. 1995).

### III. CONCLUSION

For these reasons, the Court **grants** petitioner's Petition for Recognition and Enforcement of Arbitration Award (Doc. 1), and confirms the Arbitral Award entered June 5, 2020. The Court **denies** Nelson's motion to strike Mexico's reply. (Doc. 21). The Court directs the Clerk of Court to enter judgment in favor of the United Mexican States in the amount of $2,054,199.00 (United States Dollars), together with prejudgment interest at the rate of 2.17% per annum from the date of the Award to the date of this Order and post-judgment interest at the legal rate under Title 28, United States Code, Section 1961.

**IT IS SO ORDERED** this 23rd day of March, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

18

Case 5:22-cv-04047-CJW-KEM   Document 25   Filed 03/23/23   Page 18 of 18